UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN ROBINSON,

                Petitioner,                                Hon. Richard Alan Enslen

v.                                                 Case No. 1:04-CV-722

MARY BERGHUIS,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

        This matter is before the Court on Robinson's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Robinson's petition be **denied**.

## BACKGROUND

        As a result of his alleged involvement in a robbery and murder, Petitioner was charged with one count of first degree murder, two counts of armed robbery, two counts of assault with the intent to commit robbery, and five counts of possession of a firearm during the commission of a felony. (Trial Transcript, April 25, 2001, 13-15). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

<u>Steven Maycroft</u>

On the evening of August 29, 2000, Maycroft and Alfonso Loera went to the Pulaski Lodge bar.  (Trial Transcript, April 25, 2001, 137-41).  Judith Kinney, a friend of Maycroft, was working at the Pulaski Lodge that night.  *Id.* at 141.  The Pulaski Lodge closed at midnight, after which Maycroft, Kinney, and Loera went to the Schultz Haus bar.  *Id.* at 141-46.  Shortly after arriving at the Schultz Haus, three men entered the bar, firing weapons and demanding that everybody "get the fuck down" because "this is a fucking robbery."  *Id.* at 146-154.  The three men were wearing masks which covered their faces from the nose down, but Maycroft could see that all three robbers were black and were all carrying handguns.  *Id.* at 150-54, 157.

Maycroft and Kinney, as instructed, lay face down on the floor and held up their money which the robbers took.  *Id.* at 152-54.  Maycroft then heard gunshots, immediately after which Loera screamed, "I can't believe they shot me."  *Id.* at 155, 158.  The robbers then departed the bar, at which point patrons locked the doors and summoned the police and an ambulance, both of which arrived a few minutes later.  *Id.* at 158-62.

<u>Judith Kinney</u>

On August 29, 2000, Kinney was working a bartender at the Pulaski Lodge.  (Trial Transcript, April 26, 2001, 425-27).  Steven Maycroft and Alfonso Loera arrived at the Pulaski Lodge that night at approximately 10:15 p.m.  *Id.* at 427-28.  After closing the Pulaski Lodge for the night, Kinney went to the Schultz Haus with Maycroft and Loera.  *Id.* at 428-32.  Loera ordered drinks for the trio, as well as a hamburger for himself, after which the bartender, Mike Schultz, went into the kitchen.  *Id.* at 433-34.  Kinney then heard "a bunch of loud noises" and observed three

"boys" enter the bar. *Id.* at 435-36. One of the boys "shot over" Kinney's head and a second boy "shot in the ceiling." *Id.*

Kinney testified that one of the three robbers (the one that shot at her and demanded her money) was shorter than the other two. *Id.* at 437-38. Kinney indicated that she was five feet one inch in height and that this individual was "an inch or two" taller than her. *Id.* at 441. Kinney testified that the shorter robber was dressed in "all black" and wore a camouflage mask which shielded his nose and mouth. (Trial Transcript, April 26, 2001, 437-38; Trial Transcript, April 27, 2001, 455-56). The shorter robber "was the leader. . .was more violent" and "knew more about what he was doing than the other two did." (Trial Transcript, April 27, 2001, 455).

After entering the bar and shooting at Kinney, the shorter boy approached Kinney and Maycroft screaming at them to get down and give him their money. (Trial Transcript, April 26, 2001, 440-42). Kinney and Maycroft lay face down on the floor directly next to each other. *Id.* at 443. Maycroft and Kinney surrendered their money to the robber. (Trial Transcript, April 27, 2001, 450-55). After surrendering her money Kinney heard three gunshots, immediately after which she heard Loera cry out in pain. *Id.* at 458-59. Kinney testified that Petitioner's height, body size, and eyes were "consistent" with those of the shorter robber that shot at her and demanded her money. *Id.* at 455-58.

William Gilbert

On August 29, 2000, Gilbert went to the Schultz Haus, arriving around 11:00 p.m. (Trial Transcript, April 26, 2001, 297-98). He did not consume any alcohol that evening, but instead "had a couple of pops and a hamburger." *Id.* at 299. Approximately 60-90 minutes later, Steve

3

Maycroft, Alfonso Loera, and Judith Kinney arrived. *Id.* at 298-301. Maycroft and Kinney ordered drinks and Loera ordered a hamburger, fries, and beer. *Id.* at 302. After taking Loera's order, the bartender, Mike Schultz, went into the kitchen to prepare Loera's food. *Id.* at 300-02.

Gilbert and Loera were standing near the bar talking when three individuals entered the bar yelling, "we're not playing no games; this ain't no joke; all you motherfuckers get down on the ground and give us your money." *Id.* at 302-07. Gilbert observed that two of the robbers were "pretty close in height" whereas the third robber was "rather shorter than the other ones." *Id.* at 307. The robbers were each carrying handguns and as they entered the bar two of the robbers fired their weapons. *Id.* at 307-10, 315-17. The robbers were all wearing "mask type towels" that covered their faces from "their nose-mouth area down." *Id.* at 312. Gilbert observed that one of the masks was black or dark blue in color, whereas another one was camouflage. *Id.* at 315, 317. He further observed that one of the robbers was wearing a camouflage jacket. *Id.* at 317. Despite the fact that the robbers were wearing masks, Gilbert could observe that all three robbers were "African-American males." *Id.* at 312.

Gilbert dropped to the floor as directed and lay on his side, facing the bar. *Id.* at 312-15. After dropping to the floor, Gilbert heard one of the robbers approach Loera and demand that he "give up the money." *Id.* at 316-17. Gilbert then heard three gunshots, fired in quick succession, after which he heard Loera scream out in pain. *Id.* at 318-21. The three robbers then fled the bar, after which Gilbert secured the door to prevent the robbers from reentering. *Id.* at 322.


Michael Schultz

On the evening of August 29, 2000, Schultz was working as bartender at the Schultz

4

Haus.  (Trial Transcript, April 25, 2001, 235-37).  Sometime after midnight, Steven Maycroft, Alfonso Loera, and Judith Kinney arrived.  *Id.* at 237-38.  After filling their drink orders, Schultz went into the kitchen to prepare a hamburger and fries for Loera.  *Id.* at 238-39.  While Schultz was in the kitchen he heard "loud voices" coming from the bar.  *Id.* at 240.  As Schultz moved to the kitchen door he "heard a gun go off."  *Id.* at 241.  He immediately ducked down in the kitchen "about eight feet" from the door that opened into the bar.  *Id.*  Schultz was unable to see what was occurring in the bar, but he heard "loud and demanding" commands to "give us the money."  *Id.* at 242-43.  While he was unable to observe the robbery, Schultz could tell from the voices that the robbery was being committed by "at least two, probably three" people.  *Id.* at 243.  After hearing three gunshots in succession, followed by the sounds of a man crying out in pain, Schultz went into the office and telephoned 911.  *Id.* at 243-45.  By the time Schultz returned to the bar the robbers had departed.  *Id.* at 245.  Schultz observed that the robbers had shot the lottery machine and had also shot a hole in the ceiling.  *Id.* at 245-48.

Dr. Bader Cassin

Dr. Cassin testified as a forensic pathologist.  (Trial Transcript, April 26, 2001, 261).  Alfonso Loera died on September 21, 2000.  *Id.* at 291.  Dr. Cassin subsequently performed an autopsy which revealed that Loera suffered three bullet wounds, one each to the back, chest, and abdomen.  *Id.* at 264-81.  The doctor recovered three bullets from Loera's body.  *Id.* at 276.  The doctor concluded that Loera died as a result of his gunshot wounds.  *Id.* at 282-84.

<u>Detective Calvin Mahan</u>

Detective Mahan assisted in the investigation of the Schultz Haus robbery. (Trial Transcript, April 26, 2001, 340-41). As part of his investigation Mahan inspected the lotto machine that was in the bar at the time of the robbery. *Id.* at 341-44. Mahan determined that the lotto machine had been fired upon and he retrieved a bullet from inside the lotto machine. *Id.* Mahan also observed in the ceiling of the bar a hole consistent with that caused by a bullet. *Id.* at 347-48. Detective Mahan explained that no attempt was made to recover fingerprints from the crime scene because (1) the police were advised that the robbers "had not touched the bar with their hands," and (2) the door through which the robbers entered and exited would have also been covered with the fingerprints of patrons and others making any identification very difficult. *Id.* at 344-46.

Detective Mahan observed the autopsy of Alfonso Loera and received into evidence the three bullets recovered from Loera's body. *Id.* at 348-51. Mahan subsequently delivered this evidence (as well as the bullet retrieved from the lotto machine) to the Michigan State Police Crime Laboratory for analysis. *Id.* at 351-54.

<u>Detective Sergeant Joshua Collins</u>

Detective Sergeant Collins was assigned to the Firearms and Toolmarks Unit of the Michigan State Police Crime Laboratory. (Trial Transcript, April 26, 2001, 377). Collins testified that firearms examination "is primarily concerned with determining whether or not a bullet or fired cartridge case is fired from a particular firearm that's to the exclusion of all other firearms out there." *Id.* at 378-79. The parties agreed that Collins possessed the necessary qualifications to testify as an expert in the area of firearms and toolmarks examination. *Id.*

Collins testified that the three bullets that were removed from Loera's body had been fired from a .38 caliber weapon or perhaps a .357 caliber weapon. *Id.* at 379-91. While Collins was not provided with any weapons from which these bullets could have possibly been fired, he was able to determine that the three bullets were fired from the same weapon. *Id.* at 388-90. Collins further determined that the bullet retrieved from the lotto machine had been fired from a .22 caliber weapon. *Id.* at 393-94. Collins testified that while .22 caliber weapons were "very common," the bullet retrieved from the lotto machine was unique in that it contained "a gold tone or gold color surface in certain areas of the projectile." *Id.* at 394-95. Collins indicated that Remington was the only company that manufactured such bullets. *Id.* at 394.

Detective Shawn Stefanich

Stefanich testified that police did not attempt to recover fingerprints from inside the bar because they had been informed that the robbers did not touch any surfaces in the bar. (Trial Transcript, April 27, 2001, 499). Moreover, no attempt was made to recover fingerprints from the door through which the robbers traveled because "numerous" other people "had gone in and out of that door, including police personnel, medical personnel, fire personnel and also the witnesses inside the bar." *Id.* at 499-500. Police officers did not recover any spent shell casings from inside the bar. *Id.* at 501-02. Stefanich testified that while shell casings are instantly ejected from an automatic or semi-automatic weapon, spent shell casings remain inside a revolver until the user manually removes them. *Id.* at 500-02.

Approximately one week after the robbery, Stefanich was informed that officers had recently questioned Ryan Robinson who was now "cooperating" with the investigation. *Id.* at 505-

7

06, 511.  Based on information provided by Robinson, officers obtained several search warrants. *Id.* at 506-07.  Stefanich assisted in executing the search of the residence at which Kenny Ware and Marlon Walker lived.  *Id.* at 507, 512.  The search of this residence did not uncover any weapons, but officers did recover several items of dark colored clothing.  *Id.* at 511-12.  Officers recovered from Ware's person a "tannish brown and blue" doo-rag (i.e., a rag or cap with strings which are used to tie it on the wearer's face).  *Id.* at 519-20.  From Walker's person, officers recovered one black and one blue doo-rag.  *Id.* at 521-22.  Inside the house, officers recovered a gray and black doo-rag.  *Id.* at 522.  Officers also executed a search of the residence in which DeMario Jones's mother resided.  *Id.* at 523.  This search uncovered a camouflage shirt and a black doo-rag.  *Id.* at 523-24.

Petitioner was arrested the following day.  *Id.* at 525-28.  A subsequent search of his residence uncovered an open box of Remington .22 caliber gold-coated ammunition.  *Id.* at 525-26, 548.  Detective Sergeant Collins testified that these bullets contained the same type of gold coating as the bullet recovered from the lotto machine.  (Trial Transcript, April 26, 2001, 396-97).

Official records revealed the following: (1) Marlon Walker is five feet six inches tall; (2) DeMario Jones is five feet nine inches tall; (3) Ryan Robinson is five feet ten inches tall; (4) Kenny Ware is five foot six inches tall; and (5) Petitioner is five feet three inches tall.  *Id.* at 529-32.

Detective Sergeant Clifton Johnson

Johnson interviewed Petitioner following his arrest.  (Trial Transcript, May 2, 2001, 615-16).  Petitioner's mother was present during this interview.  *Id.* at 616.  Prior to the interview (which Johnson recorded) Petitioner was informed of his Miranda rights.  *Id.*  While the recording of this interview was played for the jury, a transcript of such was not incorporated into the trial

transcripts. As part of his appellate brief, however, Petitioner included a transcript of his interview with Detective Sergeant Johnson. (Dkt. #23). In this interview Petitioner acknowledged participating in the Schultz Haus robbery. In this regard Petitioner's recollection was consistent with the testimony (described below) offered by his accomplices Ryan Robinson and DeMario Jones. *Id.*

DeMario Jones

Jones testified at Petitioner's trial pursuant to an agreement with the Muskegon County Prosecutor's Office. (Trial Transcript, April 25, 2001, 191). Pursuant to this agreement Jones pleaded guilty to the following charges: (1) one count of second degree murder; (2) two counts of armed robbery; and (3) three counts of possessing a firearm during the commission of a felony. *Id.* at 192. In return, officials declined to charge Jones with first degree murder. Jones was also required to "cooperate fully and testify truthfully in any and all proceedings pertaining to" any of the other individuals involved in the Schultz Haus robbery. *Id.*

Jones testified that as of August 2000, he associated with Petitioner, Marlon Walker, Kenny Ware, and Ryan Robinson. *Id.* at 194-97. A couple of weeks prior to the Schultz Haus robbery, Walker informed Petitioner, Jones, Ware, and Robinson that he "wanted to go rob the bar." *Id.* at 197. Prior to the robbery, Jones had observed (on at least three occasions) Walker carrying a .38 caliber handgun and Petitioner carrying a .22 caliber handgun. *Id.* at 199.

On the evening of August 29, 2000, Petitioner, Jones, Ware, Walker and Robinson were hanging out and drinking beer. *Id.* at 200-02. Near midnight, the five of them "took off walking" towards the Shultz Haus bar. *Id.* at 196, 202. After arriving at the bar, the five of them stopped in the alley to plan the robbery. *Id.* at 203. They agreed that Petitioner, Jones, and Walker

9

would enter the bar and commit the robbery while Ware and Robinson remained outside to watch for the police. *Id.* at 203, 205. Petitioner, Jones, and Walker were selected to commit the robbery because they "was the craziest three." *Id.* at 204. Before entering the bar, Petitioner, Jones, and Walker all covered the lower part of their faces with doo-rags. *Id.* at 205. Petitioner, Jones, and Walker were all carrying weapons. *Id.* at 214. Petitioner was carrying the same .22 caliber handgun that Jones had witnessed him carrying previously. *Id.* at 214-15.

As soon as the three entered the bar they shouted at everybody to get down and surrender their money. *Id.* at 207-08. Petitioner then "shot up in the ceiling once and then headed towards some woman" and Walker went to the cash register. *Id.* at 206-07. Jones remained by the entrance and witnessed Petitioner rifling through the pockets of the bar's patrons. *Id.* at 208, 221-22, 229. As the three robbers prepared to exit the bar, a man "grabbed" Walker and tried to take his weapon. *Id.* at 209-10. The two men "got to scuffling a little bit, so [Walker] fired off one shot." *Id.* at 210. The two men continued to scuffle, at which point Walker fired two more shots. *Id.* The man let out a "loud scream" and fell to the floor. *Id.* at 210, 214. Petitioner, Jones, and Walker then ran out of the bar and met up with Ware and Robinson. *Id.* at 210-11. The five of them then ran to Walker's house. *Id.* at 211-12.

Ryan Robinson

Robinson testified at Petitioner's trial pursuant to an agreement with the Muskegon County Prosecutor's Office. (Trial Transcript, April 27, 2001, 555). Pursuant to this agreement, Robinson (who was 17 years old at the time) agreed to be designated as an adult and pleaded guilty to second degree murder and armed robbery. *Id.* In return, the court retained the ability to sentence

10

Robinson as an adult or as a juvenile. *Id.* at 556. Robinson was also required to "testify truthfully and cooperate fully" in this matter. *Id.*

Robinson testified that he and Petitioner had been friends for several years and that the two of them would "hang around" together every day. *Id.* at 559-60. Robinson began associating with Kenny Ware, Marlon Walker, and DeMario Jones a "couple months" prior to the Schultz Haus robbery. *Id.* at 561-62. Robinson testified that Petitioner carried on his person a .22 caliber revolver "all the time." *Id.* at 563-64. Walker possessed a .38 caliber handgun and Ware possessed a nine millimeter handgun. *Id.* at 564-65.

On the night of the robbery, Robinson, Ware, Walker, Jones, and Petitioner began talking about robbing the Schultz Haus. *Id.* at 565-66. They had all been drinking beer. *Id.* at 568. The five agreed that Walker, Jones, and Petitioner would enter the bar and commit the robbery, while he and Ware remained outside the bar to "watch out" for the police. *Id.* at 566-69. As they walked toward the Schultz Haus, Robinson observed that Petitioner, Jones, and Walker were all carrying handguns. *Id.* at 568. Petitioner and Walker were carrying their own weapons and Jones was carrying a weapon given to him by Ware. *Id.* at 566, 569. Walker, Jones, and Petitioner, all of whom were wearing doo-rags to cover their faces, entered the bar. *Id.* at 569-71.

After the three men entered the bar, Robinson heard several gunshots. *Id.* at 571. After the trio departed the bar, all five men ran back to Walker's house. *Id.* at 571-73. Walker acknowledged that he shot Loera because he "grabbed him." *Id.* at 572-73. After returning to Walker's residence, Petitioner and Walker removed the spent shell casings from their revolvers and deposited them in the trash. *Id.* at 573. Petitioner then took the money he obtained in the robbery and "went and bought some weed." *Id.* at 574-75.

11

<u>Kevin Robinson</u>

Petitioner testified that on the morning of August 29, 2000, Ryan Robinson came over to his house and asked if he could borrow his gun.  (Trial Transcript, May 2, 2001, 659-60).  Petitioner agreed and gave his weapon to Robinson, who left at approximately 11:30 a.m.  *Id.* at 660.  Petitioner testified that he then traveled to Grand Rapids with his mother to go shopping.  *Id.*  According to Petitioner he did not arrive back home until 11:45 that evening.  *Id.* at 660-61.  After returning home, Petitioner rode his bicycle to a nearby street corner where he sold drugs to several people.  *Id.* at 661-62, 680-81.

Petitioner testified that he left the street corner at approximately 1:00 a.m. and rode his bicycle to Kenny Ware's house, arriving at approximately 1:15 a.m.  *Id.* at 662.  When he arrived at the house, Ware, DeMario Jones, and Ryan Robinson were there.  *Id.* at 664.  Marlon Walker had already left to visit his girlfriend.  *Id.*  After arriving, DeMario Jones told him that he, Ware, Walker, and Robinson had "just robbed the bar."  *Id.* at 662-63.  Ryan further informed Petitioner that DeMario "shot somebody" during the robbery.  *Id.*  Petitioner testified that he then entered the house and began smoking marijuana.  *Id.* at 663-64.

According to Petitioner, DeMario Jones later approached him and offered him fifteen dollars to "say [Petitioner] was there [during the robbery and] that Marlon shot somebody."  *Id.* at 667.  When Petitioner refused, Jones told Petitioner that if he did not cooperate Jones would shoot him.  *Id.*  Petitioner testified that he confessed to participating in the robbery because he was scared of DeMario.  *Id.* at 668.

After considering the evidence, the jury found Petitioner guilty of first degree murder, two counts of armed robbery, one count of assault with the intent to commit robbery, and four counts

of possession of a firearm during the commission of a felony. (Trial Transcript, May 3, 2001, 782-83). Petitioner was sentenced to serve life in prison without parole for having committed first degree murder. (Sentencing Transcript, June 7, 2001, 9). Petitioner was also sentenced to concurrently serve 25-50 years for each conviction for armed robbery and assault with the intent to commit armed robbery. Petitioner was also sentenced to serve consecutive sentences of two years each for each conviction for possession of a firearm during the commission of a felony. *Id.* Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

  I.  The trial court improperly admitted irrelevant, improper character evidence, which was unfairly and extremely prejudicial, regarding Mr. Robinson's prior bad acts, i.e. the illegal purchase of ammunition, habitually carrying a load[ed] weapon, and a past shooting, and that he was not afraid to shoot someone if he had to. Cumulatively, the improper admission of this evidence denied Mr. Robinson's state and federal constitutional due process rights to a fair trial.

  II.  The prosecutor violated Mr. Robinson's federal and state constitutional due process rights to a fair trial where he vouched for the credibility of key prosecution witnesses and made improper arguments regarding Mr. Robinson's character.

    A.  The prosecutor improperly vouched for the credibility of co-defendants Jones and Ryan Robinson.

    B.  The prosecutor made inappropriate character arguments.

    C.  The prosecutor's misconduct denied Mr. Robinson a fair trial.

  III.  Mr. Robinson was denied his federal and state constitutional rights to the effective assistance of counsel and due process when counsel failed to object

to the prosecutor's misconduct in closing argument and the introduction of inadmissible, unfairly prejudicial evidence.

A.   Defense counsel was ineffective where he failed to object to the prosecutor's vouching for the credibility of co-defendants Jones and Ryan Robinson.

B.   Defense counsel's failure to object to the introduction of evidence that Mr. Robinson had shot someone in the past, in violation of an off-record pre-trial agreement, had procured ammunition in violation of the law in the past, and habitually carried a loaded gun, and failure to object to the prosecutor's inappropriate character arguments based upon this evidence constituted ineffective assistance of counsel.

C.   Trial counsel's deficiencies, individually and cumulatively, deprived Mr. Robinson of a fair trial and but for those deficiencies there is a reasonable probability that the outcome would have been different.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Robinson*, No. 235103, Opinion (Mich. Ct. App., May 20, 2003). Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Robinson*, No. 124250, Order (Mich., Dec. 30, 2003). On October 28, 2004, Petitioner submitted the present petition for writ of habeas corpus in which he

14

asserts the same three claims identified above.

## STANDARD OF REVIEW

Robinson's petition, filed October 28, 2004, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also,*

*Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the

relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law.  *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct.  *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence.  *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim.  As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  In such circumstances, the court conducts a *de novo* review.  *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

17

## ANALYSIS

I.        **Evidentiary Claims**

During his cross-examination of Petitioner, the prosecuting attorney elicited several admissions which Petitioner asserts violated his right to a fair trial.  Specifically, Petitioner acknowledged that "most of the time" he carried his .22 caliber revolver loaded with ammunition. (Trial Transcript, May 2, 2001, 672).  Petitioner testified that because he was not old enough to legally purchase ammunition he had to obtain it illegally.  *Id.* at 673-74.  In this respect, Petitioner further testified that he would violate the law if it suited his purpose.  *Id.* at 674.  Petitioner also acknowledged that he was not afraid to shoot anybody and that he had, in fact, previously shot somebody.  *Id.* at 671-72, 687.  Petitioner argues that this evidence was admitted in violation of Michigan evidentiary rules which prohibit the introduction of improper bad acts evidence.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.  *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*  In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness,

18

it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

On direct examination, Petitioner testified that he was not involved in the Schultz Haus robbery.  (Trial Transcript, May 2, 2001, 657-67).  He further testified that he confessed to being involved in the robbery because he was scared of DeMario Jones.  *Id.* at 666-69.  According to Petitioner, Jones brandished a weapon and threatened to shoot Petitioner if he did not tell the police that he participated in the robbery.  *Id.* at 667.  In short, Petitioner offered the theory that he confessed to participating in the Schultz Haus robbery only because he was the victim of coercion and violence.

Michigan Rule of Evidence 611(b) provides that a witness may be cross-examined "on any matter relevant to any issue in the case, including credibility."  Federal Rule of Evidence 611(b) likewise permits cross-examination on "matters affecting the credibility of the witness." Petitioner's testimony regarding his allegedly coerced confession clearly opened the door for the prosecutor to explore the credibility of Petitioner's testimony.  The testimony at issue revealed that Petitioner generally carried a loaded revolver and was not averse to violating the law if it suited his purposes.  Petitioner further testified that he was not reluctant to shoot anybody and, in fact, had done so previously.  This evidence was relevant to a central issue in the case, namely whether

Petitioner's testimony that he was a victim of coercion and violence was credible.

The Michigan Court of Appeals reasonably concluded that the evidence in question had been properly admitted. *People v. Robinson*, No. 235103, Opinion at 1 (Mich. Ct. App., May 20, 2003). Thus, Petitioner cannot establish that the admission of this evidence denied him of due process or the right to a fair trial. Accordingly, this claim presents no issue on which habeas relief may be granted.

## II.          Prosecutorial Misconduct Claims

Petitioner asserts that the prosecuting attorney improperly vouched for the credibility of Ryan Robinson and DeMarion Jones. Petitioner further asserts that the prosecuting attorney made inappropriate arguments to the jury regarding Petitioner's character. Petitioner asserts that the prosecuting attorney's misconduct deprived him of the right to a fair trial.

### A.          Vouching Claim

As noted above, DeMario Jones and Ryan Robinson both testified at Petitioner's trial pursuant to plea agreements. The specific provisions of each witness' plea agreement was elicited on direct examination by the prosecuting attorney, including the provision in each agreement that the witness testify truthfully. Petitioner asserts that informing the jury that their plea agreements required Jones and Robinson to testify truthfully violated his constitutional right to a fair trial. Petitioner also argues that his right to a fair trial was violated by the following comments, made by the prosecuting attorney during his initial closing arguments to the jury:

There's some testimony DeMario Jones in this situation, a guy who's

20

again required to tell the truth when he testifies, otherwise he's going to lose his second degree murder agreement in this case. And if you look at that, even that agreement as well as the agreement of Ryan Robinson - those are no walk-in-the-parks either. There are going to be grave and serious consequences for those individuals as well.

(Trial Transcript, May 2, 2001, 712).

Petitioner also objects, on the same grounds, to the following comments made by the

prosecuting attorney during his rebuttal comments to the jury:

When DeMario Jones got on that stand, ladies and gentlemen, he was scared, but I would submit to you he was scared about -- he didn't want to lose his agreement, so he knew he had to tell you the truth, because if you recall what his agreement is in this case, again it's not a walk in the park. Defense wants you to believe that it's some great agreement in this situation. But what it is is he's got to plead guilty to second degree murder. He's got to plead guilty to two counts of armed robbery, got to plead guilty to two counts of felony firearm. There's no agreement in regard to sentence. That will be up to the judge as to what he receives. So again, and you as you heard, he could get up to life in prison for cooperating in this case.

Do you think he's going to lie in this situation to jeopardize even the morsel that he got, one from again first degree murder to second degree murder in this situation? He knows that if he does lie he's going to lose his agreement. He's got a chance to perhaps, now that he - in this situation that he will get a better sentence than he night have if he didn't cooperate in this situation, but again, ladies and gentlemen, when you look at him and look at his testimony, him alone, his testimony alone, is sufficient to convict the defendant. He tells us what occurred, and the judge will tell you in regard to accomplice testimony you should look at it with caution and should consider what agreement they got, and he didn't get a great agreement or deal. He's got plenty that he's got to be accountable or responsible for. You should look at that in determining the credibility of his testimony, but if you believe him you can convict on his testimony alone. So if all you had in this case was Ryan Robinson, that's enough to convict the defendant in this case if you believe this testimony and it shows the defendant is guilty beyond a reasonable doubt. We would submit to you, ladies and gentlemen, that if that's all you had, that was enough because he's credible and he was

21

believable.  Same with Ryan Robinson in this situation.

Ryan Robinson, we would submit to you, was a credible and believable witness.  This is his best friend.  The defendant doesn't want you to -- he wants you to forget the fact -- He says there's no evidence in this case, but he wants you to forget the fact that his best friend has told you on the stand in this situation that again they were outside the bar; they had guns; the three guys that went in were again Kevin Robinson, Marlon Walker and DeMario Jones; the shooting took place; he heard the shooting and they came running out.

Talk about his deal -- again his deal in this situation is not a walk in the park.  Ryan Robinson has to cooperate fully and testify truthfully, and it's important to note in regard to both these witnesses -- it's not just in regard to Kevin Robinson, not just focusing on Kevin Robinson -- their deal is they have got to tell the truth about everybody, about Marlon Walker, about Kenny Ware and even about each other if they're called on to do so.  Ryan Robinson - - again an adult conviction.  He's got a chance that he will stay in the juvenile system for sentencing, maybe get out at 21, but there's also a very real and possible chance that he will get a considerable sentence again even in this situation up to life in the adult system.  It was classified and indicated, too, that the Prosecutor's Office, while they will tell the judge about the fact that he testified and cooperated, that the Prosecutor's Office is free to make any type of recommendation it wants, including in this situation lengthy prison terms for the defendant Ryan Robinson.

*Id.* at 734-37.

While it is improper for an attorney to express a personal opinion or belief as to the truth or falsity of any testimony, an attorney "must be given leeway to argue reasonable inferences from the evidence."  *United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996) (citations omitted).  Moreover, where there is conflicting testimony, "it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying."  *Id.*  Furthermore, so long as he does not improperly vouch for a witness, it is proper for the prosecutor to review the evidence presented and comment on the strength of the State's case.  *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir.

1995) (citations omitted). Improper vouching occurs only when a jury could "reasonably believe that the prosecutor was indicating a personal belief in a witness' credibility." *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993) (citations omitted). Impermissible vouching generally involves either statements in which a prosecutor asserts his own belief in a witness' credibility or comments that suggest that the prosecutor possesses special knowledge regarding a witness' credibility or of facts not presented to the jury. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).

With respect to plea agreements, the Sixth Circuit has held that prosecutors may "refer to the plea agreement of a testifying witness" and, furthermore, "may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility." *Id.*; *see also*, *United States v. Martinez-Medina*, 279 F.3d 105, 119 (1st Cir. 2002) (arguing that "cooperating witnesses had a motive to tell the truth because of the dire consequences of breaking the plea agreements - was also not improper vouching because it provided a reason, not a personal assurance, why the jury should believe the witnesses"); *United States v. Engdahl*, 2000 WL 255705 at *2 (10th Cir., Mar. 8, 2000) ("presenting evidence of a witness's obligation to testify truthfully pursuant to an agreement with the government and arguing this gives the witness a strong motivation to tell the truth is not, by itself, improper vouching").

In his initial comments to the jury, the prosecuting attorney very briefly reiterated that pursuant to the terms of their plea agreements DeMario Jones and Ryan Robinson were required to testify truthfully, otherwise they each could face "serious consequences." As the authority cited above indicates, such statements constitute appropriate argument. Before analyzing the rebuttal comments made by the prosecuting attorney, it is necessary to first put them in context by exploring

23

some of the comments made by Petitioner's counsel in his closing argument to the jury.

Petitioner's counsel pointed out to the jury that DeMario Jones had initially been charged with first degree murder, but had subsequently agreed to plead guilty to second degree murder. (Trial Transcript, May 2, 2001, 725). Counsel then argued that Ryan Robinson had previously been convicted of the felony of larceny. *Id.* at 730-31. Finally, counsel argued that Robinson and Jones both have "a lot to gain" by testifying "and implicating other individuals." *Id.* at 731. In response to the arguments by Petitioner's counsel that there existed reasons to doubt the truthfulness of the testimony offered by Ryan Robinson and DeMario Jones, the prosecuting attorney merely argued to the jury why these two witnesses should be believed. While the prosecuting attorney argued that Ryan Robinson and DeMario Jones could face serious consequences if they testified untruthfully and, therefore, possessed strong motivation to testify truthfully, the prosecuting attorney did not assert a personal belief in their credibility or suggest that he possessed special knowledge concerning their credibility or of facts not presented to the jury.

The Michigan Court of Appeals concluded that the challenged comments were not improper and did not deprive Petitioner of a fair trial. *People v. Robinson*, No. 235103, Opinion at 2 (Mich. Ct. App., May 20, 2003). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

B.      Character Argument Claim

As previously discussed, during his cross-examination of Petitioner, the prosecuting attorney elicited evidence that Petitioner generally carried a revolver, loaded with illegally obtained ammunition.  Petitioner testified that he would violate the law if it suited his purpose.  Petitioner also acknowledged that he was not afraid to shoot anybody and that he had, in fact, previously shot somebody.  During his closing arguments to the jury, the prosecuting attorney made reference to this evidence.  Petitioner asserts that such arguments violated his right to a fair trial.  The specific comments to which Petitioner objects are as follows:

> But [Petitioner] can't hide again from the forensic report and the .22 bullet found inside the lotto machine that traces back to his gun, to his ammunition.  Yeah, I got ammunition.  Yeah, I had my gun all the time.  Yeah, I shot at other people, but not this time.  Can you believe him?

> * * * * *

> It was the three crazy ones that went in, the ones that are willing to do things.  Kenny Ware knew, as the defendant himself admits, that Kevin Robinson is willing to shoot his gun.

> * * * * *

> Again consider the physical evidence, the lotto machine, where it was and where the bullet came through, the bullets that were found in [Petitioner's] house, the cartridges found in his house, the admission that he has a .22 gun that he carries, wears it all the time and that he shoots it.

> * * * * *

> The defendant wants you to believe his version, but yet he's the person that tells us I will lie whenever, whenever it suits my purpose.  If it helps me play the game.  I will lie.  Doesn't matter.  I will point guns at people.  I will send somebody else to buy my bullets and break the law for me so I can have them.  The defendant, based upon

his testimony, based on his demeanor on the stand, based upon the rest of the evidence, ladies and gentlemen, is not to be believed in this case when he now tries to retract his confession in this case.

(Trial Transcript, May 2, 2001, 710, 713, 720, 740-41).

It is improper to argue that because a criminal defendant has a "bad character" that he committed the crime in question or had a propensity to commit the crime. *See Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000). However, as previously noted, the prosecuting attorney may review the evidence presented, argue reasonable inferences therefrom, comment on the strength of his case, and even argue that the defendant is being less than truthful. As noted above, Petitioner's credibility was a legitimate issue at trial and the challenged comments constitute proper argument (regarding properly admitted evidence) that Petitioner was not worthy of belief.

The Michigan Court of Appeals concluded that the challenged comments were not improper and did not deprive Petitioner of a fair trial. *People v. Robinson*, No. 235103, Opinion at 2-3 (Mich. Ct. App., May 20, 2003). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

**III.      Ineffective Assistance of Counsel Claim**

Petitioner asserts several grounds to support the claim that his trial counsel rendered ineffective assistance. Petitioner first faults his attorney for failing to object when the prosecuting attorney improperly vouched for the credibility of Ryan Robinson and DeMario Jones. Petitioner

26

faults his attorney for failing to object to the introduction of evidence that Petitioner had previously shot somebody and usually carried a .22 caliber revolver, loaded with illegally obtained ammunition. Petitioner also faults his attorney for not objecting to the allegedly improper character arguments detailed in section II(B) immediately above.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, Petitioner must further establish that his attorney's performance was prejudicial in that it denied him a fair trial. *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

As detailed above, the prosecuting attorney did not improperly vouch for the credibility of Ryan Robinson and DeMario Jones. Also, the evidence that Petitioner had previously

27

shot somebody and usually carried a revolver, loaded with illegally obtained ammunition was properly admitted. Finally, the prosecuting attorney did not make any improper arguments regarding Petitioner's character, but instead make appropriate arguments based on the evidence properly admitted. Because all of the evidence and comments in question were properly admitted Petitioner cannot establish that his attorney rendered deficient performance in this matter.

The Michigan Court of Appeals concluded that this particular claim was without merit. *People v. Robinson*, No. 235103, Opinion at 3 (Mich. Ct. App., May 20, 2003). In light of the authority herein identified, the Court concludes that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Robinson's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                          Respectfully submitted,

Date:  January 7, 2008                   /s/ Ellen S. Carmody           
                                           ELLEN S. CARMODY
                                           United States Magistrate Judge